**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Civil Action No.: 3:12-cv-00691-GCM**

| | |
|---|---|
| REED PROPERTIES, LLC, <br> Plaintiff, <br> v. <br><br> CONCENTRA HEALTH SERVICES, INC. <br> and CONCENTRA INC., <br> Defendants. | **BRIEF IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY AND REPORTS OF JOHN MCNAMARA** |

Pursuant to Local Rule 7.1 for the Western District of North Carolina, Defendants,

Concentra Health Services, Inc. and Concentra Inc. (collectively, "Concentra") submit the

following Brief in Support of Motion to Exclude Testimony and Reports of John McNamara.

## INTRODUCTION[1]

This lawsuit is Reed Properties' attempt (as landlord) to force its former tenant

(Concentra) to pay for damages related to mold that was discovered in the leased building more

than four months after the lease expired. To recover from Concentra, Reed Properties must

demonstrate that mold discovered in July 2010 developed during the lease term (which expired

March 1, 2010) *and* that the mold was caused by Concentra. To try to meet this causation

burden, Reed Properties identified McNamara as a putative mold expert. McNamara opines that

the mold discovered in July 2010 was caused by a below-slab pipe rupture and related standing

water that was discovered in December 2009 and not by any other water source.

McNamara's testimony and reports are inadmissible under *Daubert v. Merrell Dow*

*Pharms., Inc.*, 509 U.S. 579, 595 (1993) and should be excluded for two reasons. First,

McNamara's opinions are not based on sufficient facts or data because he failed to conduct any

---

[1] A detailed recitation of material uncontested facts, including record support and citations is set forth in the brief in support of Concentra's Motion for Summary Judgment (ECF No. 18.) These undisputed facts are incorporated herein by reference.

reasonable investigation prior to rendering his opinions. Second and because he conducted no investigation, McNamara's opinions are not based on a reliable methodology. In particular, he did not know about numerous other potential water sources that may have caused the mold, and therefore, he failed to consider and rule them out before rendering his "opinion." Ultimately, McNamara acknowledged his own result-driven methodology when he admitted that his "opinion" about the source of water was really just an "assumption." (By Mr. MacHarg:)

<div style="text-align: right">55</div>

    22    Q.    But isn't one of your opinions today
    23  that the source of water that caused the mold is
    24  this water leak that occurred and was discovered in
    25  December 2009?

<div style="text-align: right">56</div>

    1    A.    Yes, sir.
    2    Q.    And in order to provide that opinion
    3  don't you think you have to reasonably rule out
    4  other potential sources of water that could have
    5  caused the mold?
    6    A.    No, sir.
    …

<div style="text-align: right">57</div>

    18    Q.    Fair to say that you just assumed that
    19  this water event which was a significant water
    20  event, you assumed that that was the water source
    21  for the mold?
    22    A.    Yes, sir.

(McNamara Dep. 55:22-57:22.) (Excerpts and exhibits from the deposition transcript of John McNamara cited in this Brief are attached as Exhibit A.) *Daubert* and its progeny require more.

Finally, McNamara's "supplemental" expert report should be stricken and excluded as it is simply an attempt to cure aspects of his deficient investigation and methodology by conducting further, post-report, post-deposition investigation. Such "supplementation" is prohibited by the rules, and it should not be considered in evaluating this motion.

## ARGUMENT

Rule 702 of the Federal Rules of Evidence governs admissibility of expert testimony.

Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)     the testimony is based on sufficient facts or data;
>
> (c)     the testimony is the product of reliable principles and methods; and
>
> (d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The Court is to serve as a "gatekeeper" to "ensure [both] the reliability and relevancy of expert testimony."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (citing *Daubert*, 509 U.S. at 597).  To discharge this gatekeeping responsibility, the Court must confirm it has "assess[ed] the reasoning and methodology underlying the expert's opinion" and "determin[ed] whether it is scientifically valid and applicable."  *Goebel v. Denver and Rio Grande Western R.R. Co.,* 215 F.3d 1083, 1087 (10th Cir. 2000) (emphasis added).  The proponent of expert testimony has the burden to "establish its admissibility by a preponderance of proof."  *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

As gatekeepers, Courts must engage in a multi-part inquiry.  *Daubert*, 509 U.S. at 591. First, the trial judge must assess whether the proposed expert testimony consists of "scientific knowledge."  *Id.* at 590; *Cavallo v. Star Enter.*, 892 F. Supp. 756, 760 (E.D. Va. 1995), *aff'd on these grounds*, 100 F.3d 1150 (4th Cir. 1996).  An expert's testimony must be "ground[ed] in the methods and procedures of science" and "supported by appropriate validation—i.e., 'good

grounds,' based on what is known." *Daubert*, 509 U.S. at 590. Thus, "conjecture, hypothesis, 'subjective belief, or unsupported speculation' are impermissible bases for expert opinion and must be discarded." *Id*.

Second, the judge must determine that the testimony will "assist the trier of fact." *Id*. at 591. This analysis focuses on "fit"—whether the testimony is relevant to an issue in the case. *Id*. As the Supreme Court stated, "'fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id*.; *see also Higgins v. Diversey Corp*., 998 F. Supp. 598, 602 (D. Md. 1997), *aff'd*, 135 F.3d 769 (4th Cir. 1998).

Finally, "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595. Accordingly, the trial court must also weigh the possible prejudice of the testimony against its probative force under Rule 403. *United States v. Dorsey*, 45 F.3d 809, 815-16 (4th Cir. 1995).

Here, McNamara's opinion fails to meet any aspect of the *Daubert* inquiry regarding "evidentiary reliability." McNamara failed to conduct any investigation beyond the facts he was provided, and as to the facts he was provided, he did not carefully consider them. As a result, when he issued his report and was later deposed, he was ignorant of numerous facts that could lead to contrary or different conclusions about what caused the mold. Similarly, his methodology was result-driven, and non-scientific. That is, since McNamara was unaware of other potential water sources that may have caused or contributed to this mold, he failed to investigate and rule them out. McNamara cannot cure the fundamental defects in his cursory investigation and methodology with further investigation and untimely supplementation. For these reasons, McNamara's opinion is inadmissible under *Daubert* and its progeny and should be excluded.

# I.   MCNAMARA'S OPINIONS ARE NOT BASED ON SUFFICIENT FACTS OR DATA.

Rule 702 requires that an expert opinion be "based upon sufficient facts or data."  Fed. R. Evid. 702(a).  "It follows that an opinion based on an inadequate or inaccurate factual foundation cannot be a reliable opinion, no matter how valid the principles and methods applied or how well-qualified the expert."  *Snoznik v. Jeld-Wen, Inc.*, No. 1:09-CV-42, 2010 WL 1924483 (W.D.N.C. May 12, 2010) (quoting *Fernandez v. Spar Tek Indus., Inc.*, No. 0:06–3253–CMC, 2008 WL 2185395, at *6 (D.S.C. May 23, 2008)); *see also Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 417 (8th Cir. 2005) (excluding expert's opinion on damages because calculation "failed to take into account a plethora of specific facts").

McNamara opines that the mold discovered in July 2010 was caused by the water Dr. Clifford Callaway ("Callaway") observed in December 2009, and not by any other water event or source.  (McNamara Dep. Ex. 3, at 23-26) (A copy of McNamara's report dated August 9, 2013 ("Report") is attached hereto as Exhibit B).)  At the same time, he admits that he does not know when the mold he observed (in photographs) actually developed.  (McNamara Dep. 284:6-12.)  This admission plainly begs the question regarding whether there were any other water events that may have caused mold to develop.  McNamara, however, did nothing to investigate whether there were any other known water events at this building before or after December 2009. He never visited the building, he conducted no interviews, he overlooked critical information in the materials he was provided, and he otherwise did nothing to search out these critical facts.  As a result, his conclusions are not based on sufficient facts or data to be reliable.

## A.   McNamara never visited or inspected the property.

Reed Properties engaged McNamara only after it remediated the building.  (McNamara Dep. 43:3-11, 50:5-9 (stating that he was engaged in February or March 2013, and he understood

that the remediation had already been completed at that time).)[2]  As a result, McNamara never inspected the building in its moldy condition.  In fact, he never visited or inspected the building at all – not even a walk-through of the parking lot.  (McNamara Dep. 49:17-50:1.)  McNamara was told that there was no need to inspect the building because the remediation was complete and there was no residual evidence of mold.  (McNamara Dep. 54:13-19, 55:14-21.)  He admitted, however, that even though the mold was gone, he still could have inspected the building to investigate other potential water sources or explanations for the mold.  (McNamara Dep. 54:20-55:5.)

McNamara also admitted that if he had been hired before the remediation, he would have insisted on inspecting the building, and this would have added certainty to his opinions and conclusions.  (McNamara Dep. 253:23-254:5.)  In fact, this is the <u>first time</u> he has been asked to provide opinions on causes of water intrusion and mold after the building has been remediated *and* the <u>first time</u> he has ever provided an opinion on a source of water causing mold without actually visiting or inspecting the building in question.  (McNamara Dep. 50:18-51:8.)  With these admissions, McNamara acknowledged the importance of inspecting a building when trying to determine what may have caused the mold inside it.

Ultimately, there are a number of easily ascertainable facts that McNamara did not know because he never inspected the building.  Each of these facts could impact his conclusion about the water source that caused the mold.  These facts, which were unknown to McNamara, include:

_____

[2] The mold was discovered in July 2010, but the building remained in its vacant, moldy condition until April 2013. (James Dep. 80:13-18 (confirming remediation work began in March 2013 and ended in April 2013) (Excerpts and exhibits from the deposition transcript of Lorne James cited in this Brief are attached as Exhibit C).)  This lawsuit was filed in September 2012.  Thus, Reed Properties had years before the lawsuit was filed and more than seven months thereafter to engage a putative expert to inspect the building while the mold was still present.

- Location and operation of floor drains inside the facility, particularly in relation to the water source and mold locations, which would impact, among other things, potential areas of exposure to standing water;

- Interior slope of the building in relation to drains and water source;

- Locations of rooms depicted in photos in relation to drains and water source;

- Whether interior walls were insulated, whether there was a vapor barrier between the first and second floors and between the second floor and the attic, and whether the attic was air conditioned in any way;

- The types, locations, and operation of the HVAC systems in relation to rooms below where mold developed;

- Recent work on the HVAC units on the second floor, including re-routing of drain lines and increased diameter drain lines;

- Evidence of other water intrusion issues visible on the floor and ceiling in the HVAC rooms on the second floor;

- Evidence of past water spills, possible mold, and other staining in the HVAC room on the second floor;

- Signs of water damage or evidence of water intrusion, if any, in the attic or on the roof;

- Existence of possible clogging of HVAC condensate lines visible on the exterior of the building which could evidence condensate overflow inside the building.

(McNamara Dep. 52:20-54:11, 155:6-8, 184:11-13, 223:5-12, 225:11-227:2, 227:3-6, 228:10-13, 228:21-23, 259:8-266:3.)

Of course, knowing some of these facts would (or should) prompt further investigation.

McNamara admitted as much during his deposition.  (By Mr. MacHarg:)

                                                                270
        **22    Q.    Fair to say that these photographs**
        **23   indicate to you areas that you would like to**
        **24   further investigate?**
        25      A.    Yes.  Sure.

(McNamara Dep. 270:22-25 (referring to photographs taken showing water intrusion events and possible mold in HVAC room on the second floor).) Any one of these facts could change his assumption about which water caused which mold.

**B.    McNamara overlooked critical facts in the materials he was provided.**

McNamara admitted that he merely "skimmed" the materials he was provided. As a result, he overlooked certain critical facts therein. (McNamara Dep. 37:18-22, 299:9-14 (acknowledging he "skim[ed]" depositions he was provided), 38:24-39:4 (acknowledging he "skim[ed]" photographs), 39:8-12 (acknowledging he "skimmed" other documents he was provided).)[3] These facts concerned things like a prior sewer/water event in the building, the building layout, and preexisting mold, yet McNamara did not know about any of them.

**1.    McNamara did not know about the prior sewage backup.**

Multiple witnesses testified about the prior sewage backup at the building, including Callaway and Rachel Sheesley ("Sheesley") whose transcripts were provided to McNamara. (McNamara Dep. Ex. 2 (listing of materials provided to McNamara, including transcripts for Callaway and Sheesley); Callaway Dep. 103:11-105:15 (discussing sewage backup) (Excerpts and exhibits from the deposition transcript of Dr. Clifford Callaway cited in this Brief are attached as Exhibit D); Sheesley Dep. 22:10-23:12, 29:7-32:13, 38:21-39:13 (discussing backup from floor drains) (Excerpts and exhibits from the deposition of Rachel Sheesley cited in this

---

[3] McNamara's report does not comply with Rule 26(a)(2)(B) in that the report does not contain or even identify with reasonable particularity the facts or data that he considered in rendering his opinions. (*See* McNamara Dep. Ex. 3.) Reed Properties purported to supplement the report by letter dated August 23, 2013 which encloses a CD purporting to contain all of the information McNamara considered. McNamara confirmed that these were the materials he skimmed. (McNamara Dep. 11:24-12:15, Ex. 2.)

Brief are attached as Exhibit E.)[4]  Nevertheless, McNamara was completely unaware of this

sewage backup, and said it was something that he would like to research.  (By Mr. MacHarg:)

> 20    **Q.    Are you aware that -- of any sort of**
> 21  **sewage backups in the building?**
> 22      A.    No, sir.
> 23    **Q.    If there was a sewage backup in the**
> 24  **building that involved an inch or more of raw**
> 25  **sewage, liquid raw sewage throughout the entire**

> 1  **first floor space, would that be something that was**
> 2  **of interest to you in trying to determine the water**
> 3  **source for the mold that was found in the building**
> 4  **in July of 2010?**
> 5      A.    That would be a very interesting point
> 6  for me to research, yes, sir.
> 7    **Q.    And you don't have any facts or**
> 8  **information on that?**
> 9      A.    No, sir.

(McNamara Dep. 227:20-228:9.)

> **2.    McNamara did not know where the mold was in the building.**

By pairing photographs of mold to the building layout, Callaway identified the precise

locations of the mold inside the building.  (Callaway Dep. 188:23-194:11, Exs. 6 (layout) and 15

(photographs) (marking photograph locations on building layout.)[5]  From this testimony,

McNamara could have determined where the moldy areas were in relation to the water source

---

[4] Sheesley, who had worked in the building for years, also discussed rumors of a much worse water event that pre-dated her work at the facility, which was claimed to involve a "knee deep" flood.  (Sheesley Dep. 43:12-45:20, 57:2-9).  Although these rumors were not corroborated by other witnesses, had McNamara actually read Sheesley's deposition, he would have yet another potential water source to investigate.  Instead, he was unaware of any prior floods at the building.

[5] Travelers' insurance adjuster, Matthew Ingham ("Ingham"), also testified as to the locations of the photographs that he took.  (Ingham Dep. 39:7-20, 54:20-57:24, Exs. 2 (photographs) and 3 (layout) (Excerpts and exhibits from the deposition transcript of Matthew Ingham cited in this Brief are attached as Exhibit F).)  Ingham's deposition was taken on July 26, 2013, weeks before McNamara served his report on August 9, 2013 and nearly two months before McNamara's deposition on September 20, 2013.  McNamara was never provided a copy of Ingham's deposition to review.  McNamara could have also gathered this information through other investigation, including discussions with counsel.

and standing water that Callaway observed.  McNamara, however, had no idea what rooms were depicted in the photographs or where the mold was.  (By Mr. MacHarg:)

64
> **24   Do you know where the mold that was**
> **25   discovered in July of 2010 was located within the**

65
> **1   building footprint?**
> 2        A.        It was on most of the walls.
> **3        Q.        If I provided you a photographic layout**
> **4   of the facility would you be able to identify for**
> **5   me all of the walls that had mold on them in July**
> **6   of 2010?**
> 7        A.        No, sir.
> **8        Q.        Why not?**
> **9        A.        Because I'm not familiar with all the**
> **10   locations where the photographs were taken.**

(McNamara Dep. 64:24-65:10).  Indeed, McNamara admitted that when he considered the photographs, he did not consider their location within the building.  (By Mr. MacHarg:)

79
> **8   When you considered these photographs**
> **9   in rendering your opinions in this case about the**
> **10   source of water intrusion and the causes of mold**
> **11   and any other opinion, did you consider**
> **12   specifically the location in the building where the**
> **13   photographs were taken?**
> 14        A.        No, sir.

(McNamara Dep. 79:8-14.)

Most critically, McNamara admitted that it was important to know where in the building mold was in relation to the standing water.  Since he was unable to match photographs to the layout, he did not know that at least one mold bloom was well outside the area where Callaway indicated there was standing water.  (McNamara Dep. 174:5-13; Callaway Dep. 191:23-192:2, Ex. 6 (marking photograph of same mold bloom on layout).)  The following exchange discusses a mold bloom outside the area where Callaway saw standing water.  (By Mr. MacHarg:)

2  Don't you think that's important to
3  know, whether the wall that appears to have been
4  subject to a water event was within the area of the
5  building that other folks testified had standing
6  water in it?
7      A.    Yes, sir.
8      Q.    The photograph 2702, agree that at
9  least a portion of that photograph depicts floor to
10 ceiling mold?
11     A.    Yes, sir.
12     Q.    And your testimony is, is that the sole
13 water source for that mold development was water
14 that was being wicked up from the floor, correct?
15     A.    Yes, sir.
16     Q.    Do you know -- and you don't know where
17 in the building this room is, correct?
18     A.    Yes, sir.
19     Q.    You don't know whether it's right next
20 to the room where there was a water event or
21 totally on the other side of the building?
22     A.    Correct.
23     Q.    And that's not something that you
24 investigated?
25     A.    Yes, sir.

1      Q.    You did not investigate that, correct?
2      A.    I have not been on site.  Is that what
3  you're --
4      Q.    Right, or done some other
5  investigation?
…
8          THE WITNESS:  I think we've established
9          that already, that I have not been on site to
10         investigate that and that the pictures were
11         not labeled and were not identified as far as
12         which rooms were involved.

(McNamara Dep. 203:2-204:12.)

   **3.      McNamara did not know the location or operation of floor drains or
            the interior slope of the building.**

Callaway and others testified about the locations of several floor drains in the facility,

including one in the room where the leak was discovered, and three others within the area where

Callaway observed standing water. (Callaway Dep. 104:3-105:2, Ex. 6 (marking floor drains with solid purple circles); Spruill Dep. 50:13-51:2, Exs. 4 (marking the floor drains as red, colored-in circles) and 5 (circling floor drain in room on photograph 21 of the "wash room") (Excerpts and exhibits from the deposition transcript of Michael Spruill cited in this Brief are attached as Exhibit G).) McNamara did not know where any of the floor drains were in relation to the water, or whether they were operable as this was something he did not investigate. (McNamara Dep. 155:2-19.) The existence of interior floor drains, their operation, and the interior slope, particularly in relation to the claimed water source, can impact assumptions about which areas of the building were subject to standing water and for how long. McNamara failed to investigate any of this.

> **4.** **McNamara did not know about the pre-existing mold and drain backups in the "wash room."**

Several witnesses testified that the room labeled "wash room" was an x-ray processing room that had visible mold growth and deterioration that long pre-dated the discovery of the standing water in December 2009. (Spruill Dep. 49:12-24, Exs. 4, 5, photographs 20, 21) (marking location of "wash room" with red circle and red arrow on floor diagram and identifying photographs 20 and 21 as pictures of that room); Sheesley Dep. 9:24-10:13, 11:10-12, 13:5-14:7, 46:7-21 (testifying that this room had obvious mold, anyone could see it, everyone knew about it, and it had been there since she started in 1999).) Spruill referred to this room as a "challenge" because it had been subject to numerous prior water events caused by repeated backups of the floor drain in the room. (Spruill Dep. 49:25-50; 51:3-18.) Backups were discovered when water was observed on the floor area in the adjacent room as it would flow from the "wash room" through the wall into the adjacent room. (Spruill Dep. 62:3-24, Ex. 4) (marking area of flow

with blue arrow and circling adjacent room).)  These backups occurred two to three times a year for an estimated five years.  (Spruill Dep. 62:25-63:3, 64:25-65-8).)

Even though several witnesses testified that the extensive mold in this room was pre-existing, McNamara opined that the mold in this room was caused by water Callaway discovered in December 2009.  McNamara also had no knowledge of the repeated backups of the floor drain in this room that impacted this and the adjacent room.  (By Mr. MacHarg:)

<div style="margin-left:2em;">

114

13    **Q.   Are you able to attribute that**
14  **discoloration and deterioration to any particular**
15  **event?**
16    A.   It's my opinion that it's related to
17  the water current event that happened due to the
18  broken water line.
19    **Q.   Do you know where this room is in**
20  **relation to where the broken water line was?**
21    A.   No, sir.
22    **Q.   Do you know what this room was used**
23  **before or used for before the water line broke?**
24    A.   No, sir.
25    **Q.   Do you know whether any people have**

115

1  **provided sworn testimony about any or some aspects**
2  **of the damage that you have marked in that room as**
3  **being pre-existing?**
4    A.   No, sir.

</div>

(McNamara Dep. 114:13-115:4) (discussing Ex. 7, photograph 20).)

In response to questions from Reed Properties' own counsel, McNamara further admitted that if the mold in that room was pre-existing (which it was), it could have been a contributing cause to the other mold at the building.  (By Mr. Wilson:)

<div style="margin-left:2em;">

320

22    **Q.   The -- if, in fact, that water event**
23  **was a pre-existing condition did it -- in your**
24  **opinion was it the cause of the conditions that you**
25  **identified as causing the mold problem in the**

321

</div>

```
1  premises?
2     A.  I believe that could have been related
3  to problems causing the mold.
4     Q.   Okay.  Was it -- would it be the sole
5  cause?
6     A.  I don't know that.
```

(McNamara Dep. 320:22-321:6.)  Because McNamara did not know about the critical facts

discussed above, his opinion is not supported "sufficient facts or data" as required under Rule

702.

## II. MCNAMARA'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY.

"A reliable expert opinion must be based on scientific, technical or other specialized

knowledge and not on belief and speculation, and inferences must be derived using scientific or

other valid methods."  *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999).  "To

qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific

method.  Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,'

based on what is known."  *Morehouse v. Louisville Ladder Group LLC*, No. Civ. A. # 3:30–887–

22, 2004 WL 2431796, at *4 (D.S.C. June 28, 2004).

Proper scientific methodology involves the generation of hypotheses and the performance

of empirical testing to determine if such hypotheses can be falsified.  *Daubert*, 509 U.S. at 593.[6]

The Fourth Circuit has held that expert testimony should be excluded when it is not based on

proper testing or investigation.  *See, e.g., Cavallo v. Star Enter.*, 100 F.3d 1150, 1158-59 (4th

Cir. 1996) (experts' testimony not supported by appropriate validation because they did not

---

[6] In determining reliability, *Daubert* held that the following factors are considered:  "[1] whether the expert's reasoning or methodology has been or could be tested; [2] whether the expert's reasoning or methodology has been subject to peer review and publication; [3] the known potential rate of error; [4] and the level of acceptance of the expert's reasoning or methodology by the relevant professional community."  *Dellinger v. Pfizer Inc.*, Civ. No. 5:03-cv-95, 2006 WL 2057654, *8 (W.D.N.C. July 19, 2006) (citing *Daubert*, 509 U.S. at 593-94).

adhere to the established toxicology methodology in forming their conclusions).  Even "[a]

supremely qualified expert cannot waltz into the courtroom and render opinions unless those

opinions are based upon some recognized scientific method." *Saad v. Shimano American Corp*.,

No. 98-C-1204, 2000 WL 1036253, *4 (N.D. Ill. July 24, 2000) (quoting *Clark v. Takata Corp*.,

192 F.3d 750, 759 n.5 (7th Cir. 1999)).  Although an expert is not required to perform testing

before his opinion is admissible, the opinion must be "subject to" testing and peer review, and

the expert must account for "how and why" he reached his opinion.  *Kingsley v. Brenda and

Gene Lummus, Inc.*, No. 1:11-cv-32, 2012 WL 727091, *7 (W.D.N.C. Mar. 6, 2012).

Generally, "courts exclude experts who fail to consider alternative causes or fail to offer

an explanation for why the proffered alternative cause was not the sole cause." *Dellinger*, 2006

WL 2057654, at *10 (citing *Cooper v. Smith & Nephew, Inc*., 259 F.3d 194, 202 (4th Cir. 2001)).

Indeed, "[c]ourts have found that a causation opinion based solely on a temporal relationship is

not derived from the scientific method and is therefore insufficient to satisfy the *Daubert*

standards." *Id.*  (citations omitted).  In *Dellinger*, the plaintiff sued a pharmaceutical

manufacturer claiming the defendant's drug caused his illness.  *Id*. at *1-2.  The plaintiff sought

to use expert testimony to establish causation, i.e., that the drug caused his illness.  *Id*. at *7-8.

The Court held that the expert's methodologies and conclusions were not reliable because he

failed to test and rule out alternative causes, including the possibility that other drugs may have

caused the plaintiff's illness.  *Id*. at *10.  The Court, excluded the expert's opinion and granted

defendant summary judgment on the causation issue.  *Id*. at *10-11.

Similarly, in *Oglesby v. General Motors Corp.,* a plaintiff brought a product liability

lawsuit against a truck manufacturer based on defective radiator hose.  190 F.3d at 246.  The

plaintiff's expert, a qualified mechanical engineer, opined that a plastic connector on the hose

was misshaped and defective when it left the manufacturer's custody. *Id*. at 250. The Fourth

Circuit explained, however, that the expert could not fairly assume that the misshape was a

manufacturing defect rather than something caused by heat or stress when the expert did not

know the composition of the plastic, he did not analyze or test the part, and he did not apply any

other calculations. *Id*. Thus, the Court held that the expert opinion was unreliable because he

"could not eliminate other equally plausible causes" for the misshaping of the plastic part,

including engine overheating. *Id*. (emphasis added).

**A.  McNamara admitted that his opinion is really just an assumption.**

McNamara did not investigate, let alone eliminate, any other potential water sources or

plausible causes. It was not surprising then, that McNamara admitted that his "opinion" about

which water caused the mold was really just an assumption. (By Mr. MacHarg:)

<div style="margin-left:2em">

55

**22  Q.  But isn't one of your opinions today**
**23  that the source of water that caused the mold is**
**24  this water leak that occurred and was discovered in**
**25  December 2009?**

56

 1  A.  Yes, sir.
** 2  Q.  And in order to provide that opinion**
** 3  don't you think you have to reasonably rule out**
** 4  other potential sources of water that could have**
** 5  caused the mold?**
 6  A.  No, sir.
…

57

**18  Q.  Fair to say that you just assumed that**
**19  this water event which was a significant water**
**20  event, you assumed that that was the water source**
**21  for the mold?**
22  A.  Yes, sir.

</div>

(McNamara Dep. 55:22-57:22.)

Indeed, the unreasonableness of McNamara's "assumption" about the water source is even more glaring when juxtaposed with his other testimony that some of the mold discovered in July 2010 may have been there undetected for years. (By Mr. MacHarg:)

284

6    Q.   Are you able to say when those mold
7  blooms that you say are behind the wallpaper at
8  that point developed?
9    A.   No, sir.
10   Q.   Can you say whether they developed
11  within the last six months or six years?
12   A.   No, sir.
13   Q.   You agree that the mold blooms that
14  appeared to be behind the wallpaper would not be
15  detectable visually by someone who's not trained to
16  look for that sort of thing?
17   A.   Correct.
…

316

2  Q.   You agree based on your specialized
3  knowledge, training, education and experience that
4  at least some of the mold that was found behind the
5  wallpaper in July of 2010 could have been there for
6  years?
7    A.   I don't think I agreed to that.  It's
8  -- that's possible.  It's possible.  That's a
9  possibility.

(McNamara Dep. 284:6-17, 316:2-9.)

**B.    Further investigation was required, and it would have revealed other potential causes.**

As noted, McNamara conducted no interviews, not even with his own client, Callaway, who was one of the primary witnesses to the water and the mold.  Indeed, McNamara admits that he did not investigate any other possible sources, even though he could have.  (McNamara Dep. 152:10-13.) (By Mr. MacHarg:)

57

23   Q.   And you didn't investigate any other
24  possible sources?

17

25    A.   No, sir.

1    **Q.   And would you agree that all you would**
2  **have needed was access to the building for you to**
3  **investigate the following things; investigate the**
4  **attic space to make sure there weren't any holes or**
5  **water intrusion or evidence of water intrusion?**
6     **Correct?**
7    A.   Yes, sir.
8    **Q.   You could have investigated and**
9  **inspected the HVAC units to make sure that they**
10  **were working properly, that there weren't any**
11  **weeping lines, there weren't any oddly-placed**
12  **condensate drain lines, et cetera?**
13     **You could have investigated that?**
14    A.   Yes, sir.
15    **Q.   You could have investigated the floor**
16  **or other areas of the building to visually confirm**
17  **that it didn't appear to you that there were other**
18  **potential sources of water intrusion in the**
19  **building, correct?**
20    A.   Yes, sir.
21    **Q.   But you didn't do any of those things?**
22    A.   I didn't feel there was a need to do
23  that.

(McNamara Dep. 57:23-58:23.)

     Had McNamara conducted any investigation beyond skimming the materials he was provided he would have discovered at least some of the easily ascertainable facts described above. For example, had he inspected the building (even after the remediation was completed) he would have seen the water damage and possible mold on the second floor, which presumably, would have prompted further investigation. He would have seen and presumably investigated the reasons behind the recent changes to the HVAC system, and he would have learned that the HVAC system on the second floor historically and repeatedly leaked water down onto the first floor through the ceiling tile, including inside areas where mold blooms were discovered. (Weyersberg Dep. 95:8-13, 127:9-128:7, 162:11-17 (noting that the HVAC drain lines re-routed

to the exterior of the building, previously routed to an interior wall) (Excerpts and exhibits from the deposition transcript of Ronald Weyersberg cited in this Brief are attached as Exhibit H); Spruill Dep. 78:3-80:12 (discussing recurring and repeated HVAC leaks that had occurred for years due to the clogging of drain lines, which caused water to drip through ceiling tile onto the first floor).) He could have investigated and possibly ruled out that some or all of the water was the result of a leaky roof.

Had McNamara reviewed the materials he was provided more thoroughly, including the report of Travelers' engineer, he could have investigated and possibly ruled out the potential mold causes noted by Travelers' engineer, including that mold was caused by moist air infiltrating the wall cavity. (*See* Callaway Dep. Ex. 19 (Report of Travelers' Engineer, dated November 16, 2010) (discussing various potential mold causes, including moisture inside interior wall cavities).) Similarly, he would have known about the past sewage backup, the location of mold in relation to standing water, the locations of floor drains, and the extensive pre-existing mold. He would have learned that the "wash room," the room from which the water emanated, had its own floor drain, but also had been the subject of numerous prior backups.

In his report, McNamara attempted to bolster his "assumption" about there being a single water source by stating "[t]here is evidence that there was not substantial mold growth at the time Concentra took possession of the building." (McNamara Report at p. 31 n.55) (citing to page and line from William Demianczyk's deposition).) In fact, McNamara, had never seen Mr. Demianczyk's deposition, and he did not read this testimony. (By Mr. MacHarg:)

<div align="right">288</div>

18   **Q.    Did you actually review those pages of**
19   **Mr. Demianczyk's deposition?**
20      A.    No, sir.
21   **Q.    Do you have any idea what he testified**
22   **about in those pages?**

```
23      A.    That there wasn't mold there prior to
24   the time they occupied it.
25      Q.    But you don't know what those pages
                                                289
 1  say, do you?
 2      A.    No, sir, I have not read those.
```

(McNamara Dep. 288:18-289:2.)

Citing to deposition testimony that he did not actually read as support for his primary conclusion is perhaps the most emblematic deficiency with McNamara's methodology. Such conduct exemplifies the inadequacy of the investigation underlying his opinions in this case.

In sum, McNamara's central opinion regarding the cause of mold is inadmissible because it is not based on any scientific method. As discussed, McNamara could not articulate "how and why" he reached his opinion without admitting that his opinion was really an assumption. *Kingsley*, 2012 WL 727091, *7. Moreover, McNamara's purported methodology did not even consider, let alone investigate and eliminate other plausible causes for the mold. *Oglesby*, 190 F.3d at 246. Accordingly, McNamara's opinion is "not the product of reliable principles and methods," and it should be excluded.

## III.    MCNAMARA'S SUPPLEMENTAL REPORT SHOULD BE STRICKEN.

McNamara's purported "supplemental" expert report is not a true supplementation and should be stricken as untimely and improper. Rule 26(e)(1) requires supplementation when a "party learns that in some material respect the information disclosed is incomplete or incorrect." *Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 630 (E.D.N.C. 2008). "Supplementation of an expert report permits a party to correct inadvertent errors or omissions." *Id.* It does not cover failures of omission because the expert did an inadequate or incomplete preparation. *Id.*; *Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C. 2002); *Jeld-Wen*, 2010 WL 1924483, at *8; *see also Beller ex rel. Beller v. United States*, 221 F.R.D. 696,

701 (D.N.M. 2003) ("[Rule 26(e) ] does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report"); *Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 662 (N.D. Ga. 2001) ("In short, Rule 26 imposes a <u>duty</u> on Plaintiffs; it grants them no <u>right</u> to produce information in a belated fashion." (emphasis in original)). Accordingly, "[t]he court cannot accept a definition of supplementation which would essentially allow for unlimited bolstering of expert opinions." *Aveka*, 212 F.R.D. at 310. "[T]o construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would reek havoc in docket control and amount to unlimited expert opinion preparation." *Id.*

Furthermore, supplementation of an expert report "is not a license to amend an expert report to avoid summary judgment." *Gallagher*, 568 F. Supp. 2d at 630 (citations omitted). Indeed, "Courts distinguish 'true supplementation' (e.g., correcting inadvertent errors or omissions) from gamesmanship, and have therefore repeatedly rejected attempts to avert summary judgment by "supplementing" an expert report with a "new and improved" expert report. *Id.* at 631 (citations omitted). Accordingly, pursuant to Rule 37, "[i]f a party fails to [timely] provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Moreover, Rule 16(f) provides that the trial court may enter an order excluding an expert's untimely report for failing to follow the expert disclosure deadlines of a scheduling or other pretrial order. Fed. R. Civ. P. 16(f); *Aveka*, 212 F.R.D. at 311.

In *Jeld-Wen*, *Aveka*, and *Gallagher*, the Western District, Middle District, and Eastern District, respectively, excluded "supplemental" expert reports because they were not true

supplements permitted under Rule 26. In those cases, the putative experts submitted supplemental reports to try to bolster their previous reports. For example, in *Gallagher*, the defendant's expert submitted a supplemental report in response to the plaintiff's motion for summary judgment, which had "extensively attacked" the expert's initial report and deposition testimony. 568 F. Supp. 2d at 629. In fact, the defendant attached the supplemental expert report to its response to the plaintiff's summary judgment motion. The Court noted that the supplemental report was not filed to correct an inadvertent error or omission, but instead was filed "to address the numerous problems in the expert report that plaintiffs discussed in moving for summary judgment." *Id*. at 631. The Court noted that allowing the new report as permissible supplementation under the rules "would promote gamesmanship and delay." *Id.* As a result, the Court excluded it. *Id.*

Similarly, in *Jeld-Wen*, the plaintiff's window expert submitted a supplemental expert report that was stricken as improper and untimely. *Id*. at *9-10. In that case, the plaintiff's expert, Dr. Durig, opined that the design of a window casement was defective and that an alternative design would have prevented the plaintiff from falling through the window. *Id*. at *6-7. The defendant filed a *Daubert* motion to exclude Dr. Durig's testimony because, among other things, he failed to test any of his proposed alternative designs. *Id*. at *8. In response to the *Daubert* motion, Dr. Durig submitted an affidavit stating that since his initial expert report and deposition, he had performed testing on the alternative designs and that his testing confirmed the opinions expressed in his original report. *Id*. This Court characterized Dr. Durig's affidavit as "new opinions and testing to support his previously disclosed opinions" and "an attempt to bolster Dr. Durig's opinions" and "shore up weaknesses in Dr. Durig's opinions that were exposed by the Defendant's *Daubert* motion." *Id*. at *9. The Court rejected the contention that

"Dr. Durig's affidavit merely confirms the validity of his prior opinions," noting that the plaintiff "offere[ed] no explanation as to why such testing could not have been performed much earlier so that the test results could have been disclosed and fully discovered by the Defendant." *Id*.

Here, Reed Properties timely served McNamara's expert report on August 9, 2013. Thereafter, Concentra thoroughly and directly challenged McNamara's assumptions and lack of investigation both during McNamara's deposition on September 20, 2013 and in the report of Concentra's putative mold expert, Andrew Schauder ("Schauder"), which was timely served on October 4, 2013. (A copy of Schauder's report is attached hereto as Exhibit I).

On October 24, 2013 – two and a half months after the applicable expert report deadline and service of McNamara's original report, over a month after McNamara's deposition, three weeks after service of Concentra's expert report, and <u>one day</u> before the close of discovery, Reed Properties served a supplemental expert report titled, "Expert Report Continued on behalf of Reed Properties." (A copy of the service email and supplemental report of McNamara is attached hereto as Exhibit J). Reed Properties served this putative supplement without warning or any further explanation.

A plain reading of this "supplement" confirms that it is nothing more than an attempt to bolster McNamara's deficient original investigation. To wit, McNamara explains that he has now "reviewed" (presumably as distinguished from "skimmed") the depositions taken in this case – including the depositions he had (or could have been provided) prior to service of his original report and deposition. In fact, only two depositions occurred *after* McNamara's deposition, Weyersberg and Spruill. The facts provided by Weyersberg and Spruill were presumably known or can fairly be imputed to Reed Properties – as they concerned Reed Properties' own building. Indeed, Weyersberg was the contractor who rebuilt the building, and

Spruill is the former building maintenance person familiar with past water issues at the building and who was also hired by Callaway to supervise the rebuild in April 2013. Stated differently, unlike Concentra, there is no reason why McNamara could not have discovered the facts supplied by Weyersberg and Spruill by interview with Reed Properties or these witnesses.

Ironically, by attempting to bolster his prior opinions, McNamara's "supplement" highlights his own prior deficiencies. For example, he now "reviews" the depositions he was provided, rather than skimming them. (McNamara Suppl. Report at pp. 1-2.) He also now attempts to identify and rule out potential alternative causes that he did not consider the first time around. (*Id*. at pp. 2-4.)

Importantly and as was the case in *Gallagher* and *Jeld-Wen*, McNamara's attempt to cure his own deficiencies comes only after the deficiencies were made clear during his deposition and in the report of Concentra's putative expert. (*See* Schauder Report.) To permit this supplement would nullify the expert deadline and would promote the very gamesmanship and unlimited bolstering that was condemned in *Gallagher* and *Jeld-Wen*. *Gallagher*, 568 F. Supp. 2d at 631; *Jeld-Wen*, 2010 WL 1924483, at *8. Albeit untimely, McNamara's supplemental report is simply a "new opinion," only this time backed by a modicum factual investigation. The Court in *Jeld-Wen* encountered the same situation and rejected the supplement. 2010 WL 1924483, at *9. That is, Dr. Durig could have tested alternative window designs before issuing his first report, but he did not. Likewise, McNamara could have investigated all of the factual matters outlined in his supplement before disclosing his opinion. He could have visited the property site (which he still has not done); he could have reviewed (rather than skimmed the depositions he was provided); he could have interviewed his own client and others. But like Dr. Durig, McNamara waited until these deficiencies were pointed out by others until he tried to correct them.

Finally, permitting this supplement would prejudice Concentra. As noted, the supplement was served on the last day of discovery, and on the virtual eve of summary judgment. As a result, this late disclosure cannot be cured without further depositions or discovery, and experts in this case have been extensively deposed. And even if such discovery were permitted, it would likely result in supplemental summary judgment briefing and delay of the trial date. All of which expense and delay fails to serve the interests of judicial economy and could have been avoided.

Accordingly, pursuant to Rules 16 and 37 and consistent with the reasoning and rulings in *Jeld-Wen*, *Aveka*, and *Gallagher*, this Court should exclude the supplemental report of McNamara as improper and untimely supplementation.

## CONCLUSION

For the reasons discussed above, Concentra respectfully requests that its Motion to Exclude Expert Testimony and Reports of John McNamara be granted.

This the 15th day of November, 2013.

> */s/ Jeffrey P. MacHarg*
> Jeffrey P. MacHarg, N.C. State Bar No. 37546
> C. Bailey King, Jr., N.C. State Bar No. 34043
> Timothy P. Lendino, N.C. State Bar 43003
> SMITH MOORE LEATHERWOOD LLP
> 101 North Tryon Street, Suite 1300
> Charlotte, North Carolina 28246
> Telephone: (704) 384-2600
> Facsimile: (704) 384-2800
> E-mail: jeff.macharg@smithmoorelaw.com
> bailey.king@smithmoorelaw.com
> tim.lendino@smithmoorelaw.com
> *Attorneys for Defendants Concentra Health*
> *Services, Inc. and Concentra Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the Court's Electronic Case Filing ("ECF") system, which, pursuant to Local Rule 5.3 and related administrative procedures, constitutes service upon the following counsel of record, all of whom are registered CM/ECF users:

> Patrick D. Sarsfield II
> N.C. Bar No. 20104
> NEXSEN PRUET, PLLC
> 227 West Trade Street, Suite 1550
> Charlotte, North Carolina 28202
> Telephone: (704) 339-0304
> Facsimile: (704) 338-5377
> psarsfield@nexsenpruet.com
>
> Steven Tepera
> *Admitted Pro Hac Vice*
> Reed & Scardino LLP
> 301 Congress, Suite 1250
> Austin, Texas 78701
> Telephone: (512) 474-2449
> Facsimile: (512) 474-2622
> stepera@reedscardino.com
> *Attorneys for Plaintiff Reed Properties LLC*

This the 15th day of November, 2013.

> */s/ Jeffrey P. MacHarg*
> Jeffrey P. MacHarg
> *Attorney for Defendants Concentra Health*
> *Services, Inc. and Concentra Inc.*